UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION,

         Plaintiff,

                                  Case No. 12-cv-14663

v.                                    Honorable Thomas L. Ludington

THOMAS S MULHOLLAND, et al,

         Defendants.

and

REGIONS BANK, and its successors or assigns,

         Garnishee.

_____/

**ORDER GRANTING MOTION FOR LEAVE TO FILE A REPLY BRIEF, DENYING MOTION TO STRIKE PARTIAL TRANSCRIPTS, OVERRULING UTR 2 LLC'S AND MELANIE MULHOLLAND'S OBJECTION TO GARNISHMENT, AND DIRECTING DISBURSEMENT OF FUNDS**

On October 14, 2013, judgment was entered for Plaintiff and against Defendants Thomas and James Mulholland in the amount of $910,718. ECF Nos. 25, 26. On June 27, 2016, Plaintiff submitted an application for a writ of continuing garnishment as to Defendant James Mulholland and garnishee Regions Bank. ECF No. 33. The requested writ of continuing garnishment was issued against Defendant James Mulholland, Jr., and garnishee Regions Bank the same day. ECF No. 34.

Melanie Mulholland and UTR 2 LLC ("the Objectors") filed an objection to that writ of garnishment on July 18, 2017. ECF Nos. 35, 36. Melanie Mulholland contends that she is the sole member of UTR 2 LLC, a New Mexico LLC "incorporated on July 29, 2014," and thus Plaintiff may not garnish UTR 2 LLC's bank accounts. Objs. at 2, ECF No. 36. On July 24, 2017, the Court

issued an order adjourning the hearing to July 31, 2017, converting the hearing to a telephonic proceeding, and directing the parties to submit documentation of certain positions advanced in the application for and objection to garnishment. On July 27, 2017, the Court entered a stipulated proposed order which released $10,000 dollars of UTR 2 LLC's funds for daily operations. ECF No. 44. After the telephonic hearing on July 31, 2017, the Court directed supplemental briefing on two issues: one, whether federal law allows the SEC to enforce its judgments without regard for certain state law protections that apply to private judgment-creditors; and, two, whether allegations of fraudulent transfer must be advanced in a separate action or may be resolved in a garnishment proceeding.

The parties have submitted responsive supplemental briefing. On September 5, 2017, the SEC filed a motion seeking leave to file a reply to the Objectors' response brief. ECF No. 52. On September 21, 2017, the Objectors filed a motion to strike transcripts, ECF No. 55, which the SEC filed as part of its response to the objection to garnishment, ECF No. 43.

## I.

### A.

On October 22, 2012, the SEC filed a complaint naming Thomas S. Mulholland and James C. Mulholland, Jr., as Defendants. ECF No. 1. In the complaint, the SEC alleged that the Mulhollands operated a real estate business in Michigan beginning in the 1990s. Defendants allegedly financed that real estate business by raising money from "individual investors through the offer and sale of securities in the form of demand notes." Compl. at 1, ECF No. 1. Beginning in January 2009, Defendants' real estate business began struggling financially. In response, Defendant raised approximately $2 million from approximately 75 investors.

According to the SEC, the "Mulhollands defrauded these investors." *Id.* at 2. Specifically, Defendants "told investors that they would earn 7% per year on their investment and that the returns would be generated by profits of the real estate business." *Id.* Defendants also "told investors that their principal and interest were guaranteed and that they could get their money back upon 30 days' written notice." *Id.* The SEC contended that those statements were false and misleading: the real estate business was experiencing negative monthly cash flow during most of the relevant period and so Defendants did not have the financial resources to refund investors' principal even if only a small number attempted to redeem their notes. In February 2010, Defendants sought bankruptcy protection.[1]

The SEC's complaint identified five counts: violations of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c); violations of Section 17(a)(1) of the Securities Act; violations of Sections 17(a)(2) and (a)(3) of the Securities Act; violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5; and violations of Section 15(a)(1) of the Exchange Act. The SEC requested that the Court order Defendants "to disgorge, jointly and severally, their ill-gotten gains, derived directly or indirectly from the conduct complained of herein." *Id.* at 16.

**B.**

On January 4, 2013, Defendants filed a motion to dismiss the complaint, arguing that the promissory notes which Defendants allegedly issued are not "securities" as defined by federal statutes governing securities. ECF No. 11. The Court rejected that argument and denied the motion to dismiss. ECF No. 15. On July 22, 2013, the SEC filed a motion for entry of final judgment

---

[1] James Mulholland is currently serving a "sentence related to securities violations in a criminal matter involving a prior real estate company." White Decl. at 3, ECF No. 43. Neither the original date nor the length of incarceration have been provided to the Court.

against Defendants. ECF No. 21. The SEC explained that it had "reached a settlement" with Defendants which resolved all claims against them. *Id.* at 1. Pursuant to the settlement, Defendants consented to entry of an order of disgorgement "in the amount of $690,370, representing profits gained as a result of the conduct alleged in the Complaint plus prejudgment interest thereon on the amount of $70,348 for a total of $760,718." *Id.* at 1–2. The settlement agreement further contemplated an order that each Defendant "pay a civil penalty in the amount of $150,000." *Id.* at 2.[2]

After a hearing on October 1, 2013, final judgment was entered against both Defendants. ECF Nos. 25, 26. Both Defendants were ordered to jointly and severally disgorge $690,370 in profits from the misconduct identified in the complaint, plus $70,348 in prejudgment interest, and were further independently ordered to each pay a civil penalty of $150,000. *Id.* at 5. In January 2016, the SEC filed numerous abstracts of judgment as to Thomas S. Mulholland. ECF No. 27, 28, 29. In September 2016, the SEC filed additional abstracts of judgment, this time against James C. Mulholland. ECF No. 30, 31. Each abstract provided the following operative language:

> Pursuant to Title 28 United States Code, Section 3201, this judgment, upon the filing of this abstract in the manner in which a notice of tax lien would be filed under paragraphs (1) and (2) of 26 U.S.C. 6323(f), creates a lien on all real property of the defendant(s) and has priority over all other liens or encumbrances which are perfected later in time. The lien created by this section is effective, unless satisfied, for a period of 20 years and may be renewed by filing a notice of renewal.

---

[2] On August 20, 2013 (and after a telephonic status conference), the SEC submitted a supplemental brief regarding its motion for entry of final judgment. ECF No. 23. In the supplemental brief, the SEC summarized the bankruptcy proceedings which were pending against each Defendant. Specifically, as regarded Defendant James Mulholland, Jr., the SEC explained: "There have been approximately $32.5 million in creditor claims, of which approximately $17.6 million relate to unsecured claims filed by Defendant James C. Mulholland Jr.'s investors. As of August 15, 2013, the estate has $274,225 with which to satisfy all claims and pay related expenses." Supp. Br. at 1, ECF No. 23. As regarded Defendant Thomas Mulholland, the SEC specified: "There have been approximately $35.1 million in creditor claims, of which approximately $21.2 million relate to unsecured claims filed by Defendant Thomas S. Mulholland's investors. As of June 30, 2013, the estate has $149,982 with which to satisfy all creditor claims and pay related expenses." *Id.* at 2.

*See, e.g.*, ECF No. 27 at 1.[3]

On June 27, 2017, the SEC filed a request for issuance of a continuing writ of garnishment. ECF No. 33. The application, listing James Mulholland as the Defendant and Regions Bank as the Garnishee, indicated that James Mulholland has made no payments toward the judgment previously entered. In the application, the SEC alleged that Regions Bank possesses money that is the "property of the Debtor, in his individual capacity and/or doing business as UTR 2 LLC." App. Cont. Garnishment at 2, ECF No. 33. The Clerk of Court issued the writ of continuing garnishment the same day. ECF No. 34. In response, Regions Bank indicated that it possesses $435,757.91 belonging to UTR 2. Garnishee Answ., ECF No. 43, Ex. 2.

On July 18, 2017, UTR 2 LLC and Melanie Mulholland, James Mulholland's wife, filed an objection to the writ of continuing garnishment. ECF No. 35. In the accompanying request for a hearing on that objection, the Objectors argued that James Mulholland does not own or otherwise have access to the bank accounts in question. Because the SEC does not have a judgment against either Melanie Mulholland or UTR 2 LLC, the Objectors argued that the writ of garnishment should be quashed. In response, the SEC argues that UTR 2 LLC and Melanie Mulholland are James Mulholland's "nominees" and thus "allow him to continue his business operations during his incarceration." SEC Resp. Obj. at 7, ECF No. 42. The SEC further argued that even if a transfer of assets occurred, that transfer was fraudulent. *Id.* at 8.

## C.

### 1.

The SEC is seeking garnishment of assets held by UTR 2 LLC and Melanie Mulholland, alleging that the assets in question ($435,757.91) are traceable to James Mulholland. UTR 2 LLC

---

[3] The SEC filed a significant number of abstracts. For each, the operative language quoted above is identical. The only difference between the various abstracts is the address given for the Defendant against whom it is issued.

was formed on July 29, 2014, less than a year after judgment was entered against James Mulholland. UTR 2 LLC Art. Incorp., ECF No. 43, Ex. 24. The SEC alleges that "no business activity was conducted by or through UTR 2 until in or around April 2015. White Decl. at 6, ECF No. 43. UTR 3 LLC was formed on October 26, 2015. UTR 3 Art. Incorp., ECF No. 43, Ex. 25. James Mulholland is a 77% owner of UTR 3 LLC, while Melanie Mulholland is a 23% owner. *See* UTR 3 LLC Company Agreement at 2, ECF No. 46, EX. 5.

On November 25, 2009, James Mulholland and Melanie Mulholland procured property known as "Water's Edge" for $4,050,000, located at 50651 Jefferson Avenue, New Baltimore, Michigan. 2009 Covenant Deed, ECF No. 43, Ex. 3. The Mulhollands bought the property as tenants in common, with James Mulholland receiving a 77% interest and Melanie Mulholland receiving a 23% interest. *Id.* Later, on November 10, 2015, Water's Edge was transferred to UTR 3 LLC for $10 consideration. 2015 Covenant Deed, ECF No. 43, Ex. 3.

On April 3, 2015, a Regions Bank accounts (ending in x2425) was opened for UTR 2 LLC. UTR 2 Bank Account, ECF No. 43, Ex. 10. When opened, both James Mulholland and Melanie Mulholland were authorized signatories on the account. *Id.* On April 7, 2015, James Mulholland was eliminated as a signatory. *Id.* at 3–4. On the same day James Mulholland was eliminated as a signatory, the bank account began receiving rent payments from Water's Edge. *Id.* at 11–14.

On October 24, 2016, Melanie Mulholland authorized the sale of Water's Edge from UTR 3 to a third party. Oct. 2016 Covenant Deed, ECF No. 43, Ex. 3; Melanie Mulholland Decl. at 4, ECF No. 46, Ex. 1. The SEC served a subpoena on the title company which was responsible for the sale. The title company's response revealed that the Water's Edge sold for $1,923,279.16. Water's Edge Check, ECF No. 43, Ex. 8. Melanie Mulholland alleges that "[o]ver $1,000,000 was used to pay federal income taxes owed primarily due to the sale of Water's Edge." Melanie

Mulholland Decl. at 4. The remaining funds from the sale were transferred from UTR 3's bank accounts to UTR 2's bank accounts. *Id.* The SEC contends that on November 17, 2016, one UTR 2 account received a $1.1 million deposit from a UTR 3 checking account. That assertion is supported by the bank records supplied by the SEC. *See* UTR 2 Bank Rec. Acc. x2425 at 23–27, ECF No. 43, Ex. 10. On March 22, 2017, a second UTR 2 bank account received a $222,897.05 deposit from a UTR 3 account. That allegation is likewise supported by the record. *See* UTR 2 Bank Rec. Acc. x2057 at 3–7, ECF No. 43, Ex. 11.

**2.**

The SEC also identifies a number of other properties which James Mulholland exercised control over that it asserts were either nominally purchased in Melanie Mulholland's name or subsequently transferred to her. On September 14, 2009, Melanie Mulholland purchased a property located at 334 78th Avenue, St. Petersburg, FL. 78th Ave. Deeds at 6, ECF No. 43, Ex. 4. On the same day, James and Melanie Mulholland jointly executed a mortgage deed for the property. *Id.* at 8. Similarly, James and Melanie Mulholland purchased a property located at 415 64th Avenue, St. Pete Beach, FL on April 8, 2003. 64th Ave Deeds, ECF No. 43, Ex. 5 at 6. On July 15, 2004, the 64th Avenue property was transferred to Melanie Mulholland for $10 consideration. *Id.* at 7.[4] Despite that transfer, James Mulholland acknowledged (in a Notice of Commencement of improvements to the property) in June 2011 that he still considered himself a co-owner. *Id.* at 8–9. On February 2, 2017, Melanie Mulholland transferred the 64th Avenue property to UTR 2 for $10 consideration. *Id.* at 10. Likewise, on May 21, 2009, James and Melanie Mulholland purchased property located at 7201 Boca Ciega Drive, St. Pete Beach, FL. Boca Ciega Deeds, ECF No. 43,

---

[4] The SEC alleges that Melanie Mulholland currently resides at this address.

Ex. 6. On February 2, 2017, the Mulhollands (via a document signed only by Melanie Mulholland) transferred the Boga Ciega property to UTR 2. *Id.* at 8–9.

The Objectors characterize the creation of UTR 2 and the transactions identified by the SEC as innocent and unremarkable. Specifically, the Objectors describe Melanie Mulholland's decision to incorporate UTR 2 as follows:

> In July of 2014, Ms. Mulholland had an ownership interest in various rental properties and decided to transfer her ownership interest in those rental properties into a limited liability company for various reasons, including tax planning, cost savings for insurance, liability protection, and, as a woman living by herself, to avoid tenants from finding personal information about her.

Objectors Supp. Br. at 3, ECF No. 46.

As regards the 78th Avenue, 64th Avenue, and Boca Ciega properties, the Objectors argue that the SEC has no right to attach on or garnish those properties: "Paragraph 17 of Plaintiff counsel's declaration fails to disclose that the properties listed that were owned by James Mulholland and Melanie Mulholland were owned expressly as husband and wife, and therefore owned by the entirety. Consequently, the SEC has no right to attach on or garnish property owned by the entirety." *Id.* at 5 n. 3.[5]

### 3.

The SEC also relies upon statements made in a series of jail telephone calls between James and Melanie Mulholland.[6] On August 6, 2016, the Mulhollands discussed Water's Edge. August 6, 2016, Tr., ECF No. 43, Ex. 14. Melanie Mulholland told her husband: "You left me in good shape, so I'm ok. I can – I can tell everybody. I'm good." *Id.* at 3. In response, James Mulholland

---

[5] The Objectors concede, however, the Water's Edge was owned by the Mulhollands as tenants in common. *Id.* at 6.

[6] The Objectors have filed a motion to strike the jail telephone call transcripts. ECF No. 55. In response, the SEC argued that the transcripts should not be stricken and, for good measure, produced full copies of the transcripts to the Objectors. In their reply brief, the Objectors appeared to abandon their argument that the transcripts should be stricken. Despite that apparent concession, the Objectors' arguments regarding the reliability and admissibility of the transcripts will be addressed below.

stated: "I'm just worried. Concerned most about water's edge, because I want to make sure that everything's cool there." *Id.* They then discussed the sale of Water's Edge:

> [Melanie:] I'm going to call Dan Forhan (phonetic) on Monday or whenever and let him know. I guess I'm just going to say you're out of the picture and just leave it at that, and he needs to get this cranking to sell the property. . . .
>
> [James:] Well, Melanie, just hold on. Let me – let's think this through. I've thought about it a lot. . . .He doesn't need to know about it. . . . He doesn't need – just communicate via email. He doesn't need to know about anything, because that will just probably complicate things.
>
> [Melanie:] Okay.
>
> [James:] So don't tell him, don't tell him.
>
> [Melanie:] Okay. All right.
>
> [James:] And then you know, when it comes down to the closing, then you could just say, "Well Jim is, you know" . . . "laid up." Just say, "laid up" or something. And can't make the closing.

*Id.* at 3–4.

On August 9, 2016, the Mulhollands talked again. August 9, 2016, Tr., ECF No. 43, Ex. 15. As before, the Mulhollands discussed a number of personal matters. Eventually, James brought up Water's Edge: "Hey, you know, on water's edge, I really want to like streamline that. I – either – and I want you to go out there and be with Donna for a full day or a couple of days and get her . . . straightened out or fire her." *Id.* at 8. Melanie agreed. James continued: "All right. Well, one thing too, I don't want Donna knowing – I don't want Donna knowing about my situation." *Id.* Melanie responded: "That's what I told Mark. I said, I'm just going to say that right now you're not going to be involved for a while. And I don't want any gossip. If I hear anything, I hear anything, then that's going to be a problem." *Id.* The conversation continued:

> [James:] She doesn't even know. But I don't know if she does, if she doesn't get straightened out and do a better job, you should probably get somebody else.

[Melanie:] Right.

[James:] If Mark – if Mark wants to fire that guy, whatever.

[Melanie:] Okay.

[James:] But I don't – I'm going to write Mark a letter. I want him to like, make sure he takes care of it.

[Melanie:] He will. He's told me that he wanted to make sure that you knew that he will in your absence take care of stuff. So he does not want you to worry about it.

*Id.* at 9.

The next day, Melanie called James and informed him that his conviction and sentence was being widely reported in Michigan newspapers. August 10, 2016, Tr., ECF No. 43, Ex. 16. Melanie also told her husband that she had received several communications from friends and business associates regarding the news.

On August 12, 2016, the Mulhollands discussed potential financial penalties over the phone:

[Melanie:] Will you just – will you just ask Andrew about that too? Like restitution, can they go after like our properties and stuff?

[James:] Well, they could go after anything that's in my name, but I don't have anything in my name, right?

[Melanie:] Well, as long as – as long as Water's Edge isn't. But –

[James:] It's an LLC.

[Melanie:] I know, but when you look at the tax bill, it has your name on it.

August 12, 2016, Tr. at 9–10, ECF No. 43, Ex. 17.

The Mulhollands then discussed whether to sell Water's Edge. James recommended that Melanie try to refinance the property, and sell it if unable to refinance. *Id.* at 15.

On August 13, 2016, the Mulhollands again discussed Melanie's attempts to procure a loan:

> [James:] Hey, let's talk some business. What exactly did Dan Forham (phonetic) say to you. I want to get his phone number and call him and say, come on, dude, you got to be able to find some money. . . . What was he saying to you?

> [Melanie:] That his agreement was with you, not with me. So if they had to do anything, they'd have to do a whole other agreement with me and it just doesn't seem – it's not feasible. And second – he has to be able to get me a loan in that amount of time and all that kind of shit. He absolutely doesn't want anything to do with me, okay? Nothing.

August 13, 2016, Tr. at 6.

Later in the conversation, James advised Melanie to "get ahold of Blanton (phonetic) and see what's he's got. Because he had this guy that you could maybe do an equity position or something with him, give him a piece of the action or something." *Id.* at 8. And, when Melanie indicated that she wanted to stop talking business, James replied:

> [James:] Let's talk about it. That's what's on my mind. I want to make sure that you're okay.

> [Melanie:] I am okay. I'm okay. And honestly, I'm working on it. I've got it –

> [James:] I know you are. I know you are. Don't shut me out of it.

> [Melanie:] I'm not shutting you out of it. I just want you to know that I'm working on it. I don't want you to be stressed out about it.

*Id.* at 9.

During August 14, 2016, and August 15, 2016, phone calls, James and Melanie discussed tenants in their rental properties. August 14, 2016, Tr., ECF No. 43, Ex. 19; August 15, 2016, Tr., ECF No. 43, Ex. 20. During the August 15, 2016, call, the Mulhollands also discussed the efforts to refinance or sell Water's Edge:

> [James:] So I am going to call Dan Forhan and try to – he seems like the logical guy to help you get the loan. I don't get it. I mean, the fact that – I mean it's owning

an LLC. I don't get it. And there's almost $3 million of equity. What am I missing? What did he say? Give me some help here. What did he say?

[Melanie:] That because – just because it's – I don't know. I really don't know. . .

[James:] What's screwing up your ability to refinance? . . .

[Melanie:] I have no idea, Jim.

[James:] We've still got the asset. When I gave him the $2,500 retainer way back, I said, before I give you this retainer, I want to make sure that you're (inaudible) he said, yes. So what's changed?

[Melanie:] I don't know. I don't know.

[James:] (Inaudible) does he want to just get rid of it?

[Melanie:] I don't know. I don't –

[James:] It's such a cash cow, I don't know why we'd want to sell it and give the IRS all our money. If we could just hang onto it, that's your . . . meal ticket.

[Melanie:] I don't know. . . . I don't know what I'm supposed to do. Please stop it. . . .

[James:] I'll help you – I can help you – I can help you do this, but we need to talk and communicate. And I think it's better that you keep it. So you've got to exhaust all avenues to try to get – get it refinanced.

[Melanie:] Okay.

[James:] I know if you sold it, I guess, you're thinking, okay, you get a million dollars and you stick it in the bank somewhere and you're fine.

[Melanie:] No, that's not what I'm thinking.

[James:] No, that's the decision that we're trying to make, is what do you want? A couple hundred thousand dollars a year coming in for the rest of your life, or do you want a million dollars to get stuck in your bank account right now? I say, $200,000 a year for the rest of your life is better.

[Melanie:] Like you know all these – these are recorded, all of these conversations, right?

[James:] Yeah.

[Melanie:] Okay.

[James:] So what.

[Melanie:] I don't know. Nothing. All right, call . . . Forhan. I don't know if he'll even answer your call.

[James:] I'll leave a message (inaudible) our agreement, and he agreed to help, help us.

August 15, 2016, Tr. at 8–10.

The next day, the Mulhollands returned to their discussion of Water's Edge:

[James:] Hey, can I dictate a real quick email that I want you to send to Dan Forhan for me? Because he won't – he didn't answer my phone call and I can't leave him a voice mail. . . .

[Melanie:] Okay, go ahead.

[James:] Okay. Dan, as you are aware of, I am in a difficult situation. I am reaching out to you and pleading with you to help my wife, Melanie, obtain long-term financing on Water's Edge. . . . Before I gave you the $2,500 retainer . . . I asked – I asked you for assurance that the loan would be able to be in Melanie's name. You assured me that – I can't remember. . . . Then say, I know I have thrown a wrench into things but please, but please, out of the kindness of your heart, help her.

[Melanie:] Okay.

[James:] Then I want you to say this. You act like you're not going to say it. . . . I have confidence with all your contacts that you will be able to help her. . . . And something – and then put, let me thank you in advance for all your help. Sincerely, Jim.

August 16, 2016, Tr. at 7–8, ECF No. 43, Ex. 21.

During the Mulhollands' August 17, 2016, phone conversation, James advised Melanie to contact one of James' contacts who knew someone that "did creative financing slash equity participation or something like that." August 17, 2016, Tr. at 12, ECF No. 43, Ex. 22. The Mulhollands also discussed their rental operations. At one point, James told Melanie: "It sounds

like you got things on their way. You – you were trying to find a part-time job that you could work out of the house. And now you got one, don't you?" *Id.* at 14.

On August 18, 2016, James asked Melanie if Dan Forhan ever responded. August 18, 2016, Tr. at 4, ECF No. 43, Ex. 23. Melanie indicated that he had, and that Dan Forhan had told her that no loan would be forthcoming. The conversation then turned to rent payments from Water's Edge:

> [James:] There is a lockbox in place, and now they never, they never followed through and had us sign letters to send to tenants or anything like that. But I was wondering – my reason, where I'm going with this, I was wondering if you should maybe hold out, not make – don't make (inaudible) pull a little bit of money out of the account just in case, you know?
>
> [Melanie:] Yeah. Actually, as a matter of fact, I told Mark to have Donna just send me all the checks going forward, so.
>
> [James:] What do you mean by that?
>
> [Melanie:] Oh, any of the checks that are made out to me, I'm just going to – I'm going to deposit them in my account now. The rent checks. . . . And so, I don't want you to worry about it. It's stuff I've already thought about. And I don't think –
>
> [James:] I want – I want to be involved, okay?
>
> [Melanie:] Okay.
>
> [James:] So don't be trying to shut me out, okay?
>
> [Melanie:] I don't want you to worry about it, Jim.

*Id.* at 6–7.

Later during the same conversation, Melanie told James that "[w]e already had an offer on the property." *Id.* at 8. However, Melanie informed James that her attorney had concerns about some of the legal documents, including a power of attorney that James had signed. *Id.* at 9. Melanie told James that her attorney would be sending him a resolution resolving the issues so he could sign it. *Id.* at 12.

**II.**

Pursuant to Federal Rule of Civil Procedure 69(a)(1), "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."

### III.

### A.

The ultimate issue to be decided, and the focus of most of the parties' briefing, is whether the SEC's writ of continuing garnishment should be quashed or enforced. Several initial issues have also been raised and will be addressed first.

### 1.

The Court ordered supplemental briefing after the July 31, 2017, telephonic garnishment hearing. ECF No. 47. After the supplemental briefs were submitted, the SEC filed a motion for leave to file a response brief. ECF No. 52. The Objectors oppose the motion for leave to file a reply, arguing that the SEC makes no new arguments and has disregarded the Court's supplemental briefing schedule. ECF No. 54. Although the Court's order did not expressly contemplate a reply brief, parties seeking affirmative relief are generally permitted to submit a reply brief after the opposing party's response brief. Accordingly, the motion for leave to file a reply brief will be granted, and the reply brief attached to that motion will be accepted as filed.

### 2.

Another preliminary issue must be addressed. On September 21, 2017, the Objectors filed a motion to strike the partial transcripts of the jail telephone calls that the SEC attached to its July 25, 2017, filing. ECF No. 55. First, the Objectors argue that the transcripts constitute hearsay.

Second, the Objectors assert that the transcripts are not authenticated. And finally, the Objectors contend that, even if the transcripts are admissible, they should be produced in their entirety. In response, the SEC addresses each argument and further indicates that it has "voluntarily produced copies of the original Jail Conversations and transcripts." SEC Resp. Mot. Strike at 8, ECF No. 56. In the Objectors' two page reply brief, they argue simply that the full transcripts should have been produced from the beginning and then characterize the transcripts as "entirely innocuous and nothing more than a husband and wife talking about their day-to-day lives." Obj. Reply Br. Mot. Strike at 2, ECF No. 57. In the reply brief, the Objectors do not address the SEC's assertions that the transcripts are admissible, reiterate their request that the transcripts be stricken, or otherwise request relief.

Because the Objectors have not attempted to rebut the SEC's assertions that the transcripts are admissible, they appear to have abandoned that argument. *See Apotosky v. Fed. Bureau of Investigation*, No. 4:15-CV-1619, 2017 WL 1093890, at *6 (N.D. Ohio Mar. 23, 2017). Even if the admissibility arguments are directly considered, the Objectors' claims have no merit.

First, the transcripts are not hearsay. The SEC relies upon them not to prove that the statements made within regarding the Mulhollands' efforts to sell Water's Edge are true, but to show that James Mulholland was exercising significant control over business operations, through his wife, while incarcerated. And even if considered to be hearsay, the transcripts are admissible. As the SEC explains, the transcripts were prepared in the ordinary course of business at the Ingham County Jail. *See* Decl. Records Custodian, ECF No. 56, Ex. B. As records of a regularly conducted activity, the transcripts are admissible. Fed. R. Evid. 803(6).[7]

---

[7] For the same reason, the transcripts are self-authenticating. Fed. R. Evid. 902(4).

The transcripts are likewise admissible as opposing party statements. Fed. R. Evid. 801(d)(2). James Mulholland's statements in the transcripts are axiomatic examples of opposing party statements. Melanie Mulholland is arguably James Mulholland's agent for the matters discussed in the transcripts and/or his coconspirator in the alleged scheme to conceal assets from the SEC. And, more fundamentally, admissions by the beneficial party in interest are admissible against the nominal plaintiff representing the beneficial party's interest. *Roberts v. City of Troy*, 773 F.2d 720, 726 (6th Cir. 1985). James Mulholland, not Melanie Mulholland, is the named Defendant in this action, but because the SEC is seeking to garnish funds which Melanie Mulholland lays claim to, she is the beneficial party in interest.

Finally, and as already noted, full copies of the transcripts have been provided to the Objectors. Because the Objectors do not identify any prejudice which they sustained as a result of the later disclosure of complete copies, no relief is warranted on this ground. None of the arguments which the Objectors advance in their motion to strike have merit. The motion will be denied.

**B.**

In its first supplemental brief, the SEC argues that the Objectors do not have standing to seek dismissal of the garnishment. The SEC further argues that UTR 2, UTR 3, and Melanie Mulholland are all operating on behalf of or for the benefit of James Mulholland. And, to the extent a transfer of interest did occur, the SEC argues that it was fraudulent.

In their first supplement brief, the Objectors argue that the SEC cannot garnish assets owned by UTR 2 and Melanie Mulholland because the SEC does not have a judgment against them. The Objectors further assert that, to the extent the SEC believes that the transfer to the

Objectors was fraudulent, Michigan law requires that the SEC establish that fact in a proceeding separate from the garnishment proceeding.

In its second supplemental brief, the SEC responds to the Objectors' arguments. First, the SEC contends that, as a judgment creditor, it can execute against property held by UTR 2 and Melanie Mulholland. Specifically, the SEC asserts that James Mulholland's security violations invoked the Court's equitable power to fashion appropriate remedies, resulting in an order of disgorgement against James Mulholland. And the SEC argues that it may pursue assets held by third parties in satisfaction of a disgorgement order. Second, the SEC argues that it may pursue a fraudulent transfer claim in a garnishment proceeding. The SEC contends that, despite its voluntary compliance with Michigan law, strict compliance is not required. The SEC alternatively argues that Michigan law does not require adjudicating fraudulent transfer claims in a proceeding separate from the garnishment.

In their second supplemental brief, the Objectors argue that the SEC cannot seek an order of disgorgement against them because there is no evidence that the assets the SEC seeks to garnish are ill-gotten funds or that UTR 2 and Melanie have an illegitimate claim to the funds. The Objectors then contend that Michigan law does, indeed, require adjudication of the fraudulent transfer claim in a separate proceeding. Finally, the Objectors argue that, even if the fraudulent conveyance argument is adjudicated in this proceeding, the transfer was not fraudulent.

In its reply to the Objectors' second supplemental brief, the SEC argues that it is not seeking a separate order of disgorgement against UTR 2 and Melanie Mulholland. Rather, the SEC is attempting to enforce a disgorgement judgment that has already been entered against James Mulholland. Second, the SEC argues that "there is no requirement to trace ill-gotten gains in a collection action." SEC Supp. Reply. Br. at 3, ECF No. 52.

**1.**

In its first supplemental brief, the SEC argues in conclusory fashion that, as nonparties, Melanie Mulholland and UTR 2 do not have standing to challenge the garnishment. But that argument has no merit. The SEC is seeking to garnish assets to which Melanie Mulholland and UTR 2 have at least a facial claim. If the Objectors' arguments are correct, then the SEC is attempting to seize property to which it has no entitlement. Standing exists. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

**2.**

**i.**

The parties contest the precise character of these proceedings and the relief being sought. The Objectors' briefing asserts that the SEC is attempting to garnish assets held by parties against whom it does not have a judgment. *See* Obj. Supp. Br. at 7–10, ECF No. 46. The Objectors argue that the SEC must first establish UTR 2's and Melanie Mulholland's liability to the SEC prior to seeking a writ of garnishment against them. Similarly, the Objectors argue that the SEC may seize the assets in question pursuant to an order of disgorgement only if the SEC proves that Melanie Mulholland and UTR 2 "(1) received ill-gotten funds; and (2) [have] no legitimate claim to those funds." Objs. Sec. Supp. Br. at 3, ECF No. 51.

These arguments misconstrue both the current posture of this action and the Court's inherent authority to exercise ancillary jurisdiction over judgment enforcement proceedings. "District courts possess broad equitable discretion to craft remedies for violations of the Exchange Act." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 81 (2d Cir. 2006). "'Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities law.'" *S.E.C. v. Hughes Capital Corp.*,

124 F.3d 449, 455 (3d Cir. 1997) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C.Cir.1989)). "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996). Further, "[t]he amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation.'" *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (quoting *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995)).

And, importantly, the Court's authority to fashion equitable remedies to violations of securities law can extend to actions against third parties not accused of wrongdoing. *See S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). Specifically, "'[f]ederal courts may order equitable relief against [such] a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *S.E.C. v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir.1998)). Absent this principle, it would be simple for securities fraud violators to evade the SEC: they could simply transfer assets to innocent friends and family. *Cavanagh*, 155 F.3d at 137.

However, the amount and location of "ill-gotten funds" are considered only during the initial assessment of the amount of disgorgement to be ordered, not during post-disgorgement judgment enforcement efforts. Although this distinction is easily blurred, the Second Circuit has explained the state of the law: "[U]nlike an equitable lien or a constructive trust, disgorgement does not require the district court to apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return." *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011). *Compare F.T.C. v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 214 (D.

Mass. 2009), aff'd, 624 F.3d 1 (1st Cir. 2010) ("Disgorgement . . . is ordinarily measured by the amount of 'profits causally connected to the violation.'") (quoting *Sec. & Exch. Comm'n v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004)) *with Bronson Partners*, 654 F.3d at 374 ("[T]he Federal Reporter is replete with instances in which judges of this Court deeply familiar with equity practice have permitted the SEC to obtain disgorgement without any mention of tracing. . . . Indeed, it is by now so uncontroversial that tracing is not required in disgorgement cases that we recently rejected an argument to the contrary via summary order.") (internal citations omitted). *See also U.S. S.E.C. v. Quan*, 817 F.3d 583, 594 (8th Cir. 2016) (rejecting the defendant's argument that disgorgement must be limited to specific assets traced back to a violation); *S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset."); *S.E.C. v. Antar*, 120 F. Supp. 2d 431, 437–38 (D.N.J. 2000), aff'd, 44 F. App'x 548 (3d Cir. 2002) ("[W]hen determining the appropriate amount of disgorgement" the court must distinguish between "illegal profits gained and . . . legal profits," but the relationship of funds to the illegal activity is irrelevant when the SEC is "attempting to enforce the judgment entered and prevent the defendant . . . from dissipating his assets in frustration of that judgment.").

Thus, the Objectors' argument that the SEC must prove they in fact possess ill-gotten funds to which they have no legitimate claim prior to garnishment has no merit. Pursuant to the judgment entered on October 4, 2013, ECF No. 26, James Mulholland has already been ordered to disgorge $690,370. For that reason, the SEC may utilize any judgment enforcement procedures permitted by law to collect the judgment amount against any of James Mulholland's assets, not just those traceable to the securities violations. [8]

---

[8] The principal cases which the Objectors rely upon in their argument that the SEC must prove that the Objectors' assets are "ill-gotten funds" all involve appeals from district court decisions calculating the amount of disgorgement

**ii.**

Broadly construed, the Objectors' arguments might also be interpreted as challenging this Court's jurisdiction to order garnishment of UTR 2's and Melanie Mulholland's assets. In *S.E.C. v. Cherif*, the Seventh Circuit found that the district court did not have jurisdiction in a disgorgement action to freeze the funds of a non-party against whom no wrongdoing was alleged. 933 F.2d 403, 413 (7th Cir. 1991). But a challenge based on *Cherif* would conflate the distinction between the jurisdictional requirements for an order of disgorgement or order to freeze assets pending disgorgement and the jurisdictional requirements for post-judgment efforts to enforce or collect on an order of disgorgement.

This jurisdictional argument was addressed and rejected, in detail, in *S.E.C. v. Antar*, 120 F. Supp. 2d at 436. In *Antar*, the court entered an order of disgorgement against three defendants and six relief defendants. After the disgorgement judgment was entered, the SEC sought leave to file an amended and supplemental complaint asserting new claims against additional relief defendants. Specifically, the SEC had identified a number of transactions between the original defendants and the new relief defendants which it believed were fraudulent. *Id.* at 434. In response, the relief defendants argued that "in the absence of evidence showing that the assets transferred constitute illegal profits from Sam M.'s securities fraud, this court lacks subject matter jurisdiction." *Id.* at 436. The *Antar* Court discussed a variety of cases which held that a court's authority to order disgorgement extends only to assets that are property, or deemed property, of a culpable party. The court distinguished those cases: "The present case is in an entirely different

---

against and/or freezing assets of third parties. *See, e.g., Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009) (appeal from a preliminary injunction freezing the assets of relief defendants); *S.E.C. v. George*, 426 F.3d 786, 794 (6th Cir. 2005) (appeal from an order, entered prior to a finding of liability, directing relief defendants to disgorge assets transferred to them). Those cases thus involved *pre-judgment* transfers where the district court was tasked with determining, in the first instance, whether third parties were in possession of ill-gotten gains that they otherwise had no legitimate claim to. This matter involves *post-judgment* enforcement efforts, which does not require tracing the assets sought to wrongdoing.

poster. Here, a judgment and an order of disgorgement have already been entered against the parties who violated the securities laws." *Id.* at 438.

The *Antar* decision also discussed *SEC v. Cherif*: "In that case, the court held that, pursuant to the grant of jurisdiction under the securities laws, a district court may exercise all equitable powers over defendants and violators, but may only obtain equitable relief from a non-violator 'if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them.'" *Id.* (quoting *Cherif*, 933 F.2d at 413–14 n.11). But the court in *Antar* emphasized that even assuming "that the SEC's claims fall outside the grant of jurisdiction under the securities laws, there is still another basis for jurisdiction[:] . . . [T]raditional principles of ancillary enforcement jurisdiction." *Id.* (citing *Cherif*, 933 F.2d at 414 n.12 ("Why the SEC did not try to attach the funds directly is a mystery. Fed.R.Civ.P. 64 makes available those remedies used to secure satisfaction of a judgment 'in the circumstances and manner provided by the law of the state in which the district court is held.'")).

Federal district courts have "inherent power to enforce [their] judgments," which necessarily includes jurisdiction over enforcement proceedings. *Peacock v. Thomas*, 516 U.S. 349, 356, 359 (1996). *See also S.E.C. v. Dollar Gen. Corp.*, 378 F. App'x 511, 516 (6th Cir. 2010). In *Peacock*, the United States Supreme Court explained that ancillary jurisdiction may not be used to "impose liability for a money judgment on a person" not liable under the original judgment, but confirmed that "the Federal Rules of Civil Procedure provide fast and effective mechanisms for execution" on a judgment. *Peacock*, 516 U.S. at 359. Thus, ancillary jurisdiction exists when a party is attempting to enforce its judgment (even if that enforcement implicates third parties) pursuant to the Federal Rules of Civil Procedure, assuming the judgment creditor is not attempting to establish the new defendant's liability for the original judgment. *See Thomas, Head & Greisen*

*Employees Tr. v. Buster*, 95 F.3d 1449, 1454–55 & n.7 (9th Cir. 1996) (holding that the "district court properly exercised ancillary jurisdiction over . . . supplementary proceedings to set aside the alleged fraudulent conveyances").[9]

Here (as in *Antar*), "the SEC's claim is exactly the sort of claim approved in *Peacock*—it seeks to reach assets belonging to the judgment debtor but found in the hands of the relief defendants. The SEC seeks only to disgorge from the relief defendants, as alleged fraudulent transferees, the property [James Mulholland allegedly] wrongfully transferred to them." *Antar*, 120 F. Supp. 2d at 440.

To summarize, the SEC has obtained a disgorgement judgment against James Mulholland. Now that the amount of disgorgement has been calculated, the SEC need not trace ill-gotten gains to the assets it seeks to execute upon. Rather, the SEC may utilize all authorized judgment enforcement procedures to collect the judgment. This Court has jurisdiction to preside over post-judgment enforcement proceedings, assuming that the SEC is not seeking to establish the Objectors' liability for the underlying securities violations. The SEC is simply alleging that the Objectors possess assets which were transferred to them without consideration for the judgment debtor's interest in the assets and thus which should be "'deemed' property of a culpable defendant." *Id.* at 438. Accordingly, this Court has jurisdiction to adjudicate the SEC's attempt to garnish the assets of UTR 2 and Melanie Mulholland.

**3.**

---

[9] In *Galuska v. Geoquest, Inc.*, the Seventh Circuit affirmed the dismissal of an action (alleging fraudulent conveyance) to enforce a judgment previously entered. 172 F.3d 53 (7th Cir. 1998). Citing *Peacock*, the Seventh Circuit held that "subsequent suits to enforce judgments entered in prior federal actions must have their own source of federal jurisdiction when they involve new theories of liability, such as fraudulent conveyances," and that jurisdiction was absent. *Galuska* is a three paragraph, unpublished opinion. *Id.* Since *Peacock*, most courts "have permitted judgment creditors to pursue, under the ancillary enforcement jurisdiction of the court, the assets of the judgment debtor even though the assets are found in the hands of a third party." *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001) (collecting cases and expressly declining to follow *Galuska*).

For the reasons stated above, the SEC need not show that the assets it is attempting to garnish are "ill-gotten funds" to which UTR 2 and Melanie Mulholland have no legitimate claim. Rather, the question is whether the SEC is entitled to garnish the funds pursuant to post-judgment enforcement procedures.

**i.**

Federal Rule of Civil Procedure 69(a)(1) specifies that "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Pursuant to M.C.R. 3.101(G)(h)(1), a judgment creditor may seek to enforce its judgment via a writ of garnishment:

> Subject to the provisions of the garnishment statute and any setoff permitted by law or these rules, the garnishee is liable for . . . all tangible or intangible property of the defendant that, when the writ is served on the garnishee, the garnishee holds by conveyance, transfer, or title that is void as to creditors of the defendant, whether or not the defendant could maintain an action against the garnishee to recover the property.

*Id.*

The Objectors argue that, under Michigan law, "a writ of garnishment may not be used to establish a fraudulent transfer claim." Objs. Sec. Supp. Br. at 8. In support of that assertion, the Objectors cite *Nationsbanc Mortg. Corp. of Georgia v. Luptak*, 625 N.W.2d 385, 389 (Mich. Ct. App. 2000). In *Nationsbanc*, the Michigan Court of Appeals was tasked with interpreting Michigan Court Rule 3.101(G)(1)(h). The court in *Nationsbanc* affirmed the trial court's dismissal of a fraudulent conveyance claim because the "writ of garnishment . . . provided no notice of plaintiff's claim of fraudulent conveyance" and because the conveyance had not been declared void prior to the commencement of the garnishment action. 625 N.W.2d at 388–89. The Michigan Court of

Appeals read M.C.R. 3.101(G)(1)(h) "as requiring a previous judicial determination that the transfer at issue is indeed void." *Id.* at 389. The *Nationsbanc* decision emphasized that "requiring a plaintiff to specifically allege the factual basis for a claim of fraudulent conveyance in a separate proceeding comports with due process guarantees" because without "such specific pleadings, the garnishee's ability to resist a mistaken deprivation of property is severely compromised." *Id.*

The SEC argues that, even assuming that *Nationsbanc* requires a fraudulent conveyance claim to be established in a proceeding separate from the garnishment action, strict compliance with state law is not required.

Although "state law controls the procedure on execution and in proceedings on and in aid of execution[,] . . . [s]ubstantial compliance with the procedural provisions of the state statutes is sufficient." 12 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 3012, "What Law Governs," (3d ed. 2014). That is because "[p]roceedings to enforce judgments are meant to be swift, cheap, informal." *Resolution Tr. Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993) ("We do not think the draftsmen of Rule 69 meant to put the judge into a procedural straitjacket, whether of state or federal origin.").[10]

---

[10] *See also Thomas, Head & Greisen Employees Tr. v. Buster*, 95 F.3d 1449, 1452–53 (9th Cir. 1996) (holding that "[a]lthough Alaska R. Civ. P. 69 does not expressly authorize postjudgment fraudulent conveyance actions," adjudicating the fraudulent conveyance claim in a supplementary proceeding constituted sufficiently close adherence to state procedures); *Chambers v. Blickle Ford Sales, Inc.*, 313 F.2d 252, 256 (2d Cir. 1963) ("Under Connecticut practice, a separate action would be required in the nature of a scire facias against the alleged debtor or trustee of the judgment debtor, requiring a hearing and judgment separate from the original action. (The procedure followed here, more in the nature of one supplementary to enforcement of a judgment, accords with the spirit of the Rules and seems to be a sufficiently close adherence to state procedures.)"); *Clark v. Wilbur*, 913 F. Supp. 463, 468 (S.D.W. Va. 1996), aff'd sub nom. *Clark v. Allen*, 139 F.3d 888 (4th Cir. 1998) ("[S]ubstantial compliance with, rather than lockstep and slavish adherence to, state procedures is all that is required under Rule 69(a). A common-sense reading of § 38–5–4, combined with observance of traditional notions of due process and the Court's personal jurisdiction over the parties and the subject matter, allows the Court to order the relief requested."); *City Sav. By & Through Resolution Tr. Corp. v. Welsh*, 793 F. Supp. 1046, 1048 (W.D. Okla. 1992) (finding that state notice procedures regarding entry of a deficiency judgment were substantially complied with); *Anderson v. Tucker*, 68 F.R.D. 461, 462 (D. Conn. 1975) ("Rule 69(a) . . . makes applicable state procedural rules for the enforcement of judgments . . . . These state rules are to be applied in a common sense manner, of course, and those which make sense only when applied to state courts need not be imported into federal practice."); *Bank of Am. Nat. Tr. & Sav. Ass'n v. Bair*, 34 F. Supp. 857, 859 (D. Mont. 1939), aff'd, 112 F.2d 247 (9th Cir. 1940) ("In adopting the state practice it was never intended that the defendant could require the judgment creditor to follow every possible technical requirement that might be found in

The question, then, is whether this Court may adjudicate the SEC's fraudulent transfer claim in this proceeding while still substantially complying with Michigan law. The *Nationsbanc* opinion spends considerable time discussing the due process implications of adjudicating a fraudulent conveyance claim in the context of a proceeding initiated by a writ of garnishment. 243 Mich. App. at 567. In particular, the Michigan Court of Appeals emphasized that the "statement of claim made in a garnishment proceeding" provides only "limited information." *Id.* The advantage of a separate proceeding is that it requires the "plaintiff to specifically allege the factual basis for a claim of fraudulent conveyance." *Id.* The *Nationsbanc* Court explained that: "Without such specific pleadings, the garnishee's ability to resist a mistaken deprivation of property is severely compromised. This is especially so when the garnishee was not even a named party in the prior lawsuit and judgment from which the garnishment proceeding stems." *Id.*

*Mitchell v. Lyons Prof'l Servs., Inc.*, provides considerable guidance. 727 F. Supp. 2d 120, 123 (E.D.N.Y. 2010). In *Mitchell*, a judgment creditor filed a motion in the original federal proceeding seeking to invalidate an alleged fraudulent transfer. In response, the garnishees asserted that New York state law requires a separate special proceeding. Relying upon the numerous cases which permit a "flexible approach" to Rule 69(a), the court in *Mitchell* concluded that there was "no reason to compel plaintiffs to start over when there is a vehicle for relief presently pending." *Id.* at 125. Because the garnishees had not identified any "prejudice they [would] suffer as a result of the claims against them being raised by motion, rather than special proceeding," the court in *Mitchell* rejected the challenge to the form of the proceeding.

the state statute and decisions bearing on the subject where wholly different and distinct remedies are provided."). *But see Johnson v. City of Memphis*, No. 00-2608-STA-TMP, 2016 WL 4468861, at *5 (W.D. Tenn. Aug. 24, 2016) ("Plaintiffs' request to circumvent Tennessee law and require Defendant to deposit the backpay award into the Court's registry runs against Rule 69(a)(1)'s design and intent to follow strictly state law on the execution of a judgment.").

The Objectors' present argument is essentially identical to that made in *Mitchell*. In both New York and Michigan, state law requires (at least in most instances) fraudulent conveyance claims to be advanced in separate proceedings. Neither the garnishees in *Mitchell* nor the Objectors here have identified what prejudice they would suffer if the fraudulent conveyance claim is adjudicated in the original proceeding. To the contrary, this Court has twice directed supplemental briefing from the parties seeking supplemental attention to the law and the facts, ECF Nos. 41, 47, and the Objectors have twice briefed the merits of the fraudulent conveyance claim. *See* Objs. Supp. Br. at 10–11; Objs. Sec. Supp. Br. at 10–11. Given the production of that information, the hearing held on July 31, 2017, and the multiple rounds of briefing, the Objectors cannot reasonably argue that they have not been informed of the factual basis for the fraudulent conveyance claim or provided an opportunity to oppose it. Thus, the due process concerns which undergirded *Nationsbanc* are inapplicable here. And, to the extent a formalistic reading of M.R.R. 3.101(G)(1)(h) would require a prior judicial determination that a transfer is void before the garnishment proceeding is commenced, the Court believes that a "flexible approach" to Rule 69(a) is appropriate. As the *Mitchell* Court recognized, "there seems no reason to compel plaintiffs to start over when there is a vehicle for relief presently pending." 727 F. Supp. 2d at 125.

### ii.

Before proceeding to the merits of the fraudulent conveyance claim, another matter must be addressed. The SEC is alleging that the asset transfers from UTR 3 to UTR 2 were fraudulent and should be voided. The Objectors disagree, but argue that even if that transfer is fraudulent, the SEC is nevertheless not entitled to garnish UTR 3's assets. The Objectors assert that "the SEC has no basis to complain about such transactions before establishing that it is a creditor of UTR 3, which it is not." Objs. Sec. Supp. Br. at 11. The Objectors further argue that "[u]nder Michigan

law, there is a presumption that the corporate form will be respected." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007). And, to the extent the SEC might attempt to garnish on UTR 3's assets because James Mulholland is a 77% member, the Objectors contend that the SEC must first seek a charging order pursuant to M.C.L. 450.4507(6) ("This section provides the exclusive remedy by which a judgment creditor of a member may satisfy a judgment out of the member's membership interest in a limited liability company."). In response, the SEC argues that state law regarding the corporate form should be disregarded because UTR 2 and 3 are shell companies.

"Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics, Inc.*, 475 F.3d at 798. Factors to consider include whether there is "[c]omplete identity of interest between sole shareholder and corporation," whether "the corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations," or whether the corporate form is being used "to defeat public convenience, justify a wrong, protect fraud or defend crime." *Kline v. Kline*, 305 N.W.2d 297, 298–99 (Mich. Ct. App. 1981).

Essentially, the question is whether UTR 3 is the alter ego or nominee of James Mulholland. "Alter ego means 'other self'—where one person or entity acts like, or, for another to the extent that they may be considered identical." *United States v. Scherping*, 187 F.3d 796, 801 (8th Cir. 1999) (internal citations omitted). "A "nominee" is a person or entity who holds legal title to property that in truth belongs to another who exercises control over and realizes the benefit of it. 'Nominee status is determined by the degree to which a party exercises control over an entity and its assets.'" *Sumpter v. United States*, 302 F. Supp. 2d 707, 720 (E.D. Mich. 2004) (quoting

*United States v. Bell*, 27 F.Supp.2d 1191, 1195 (E.D.Cal.1998)). The two terms are typically used interchangeably and, at least in most situations, appear to carry no legal distinction. *Id.* at 721.

> In resolving a nominee or alter ego claim, courts consider six factors:
>
> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Porta-John of Am. Inc. v. United States*, 4 F. Supp. 2d 688, 701 (E.D. Mich. 1998). *See also Bennett v. United States*, No. 2:09-CV-12352, 2010 WL 5114331, at *12 (E.D. Mich. Dec. 9, 2010).

These factors will be considered in order. First, the transfer of Water's Edge to UTR 3 from James Mulholland and Melanie Mulholland was for grossly inadequate consideration ($10). The Objectors argue that, because James and Melanie Mulholland owned UTR 3 in the same proportion as they owned Water's Edge, James Mulholland received fair value in the transfer. It is true that James Mulholland and Melanie Mulholland initially personally owned Water's Edge as tenants in common. Specifically, James Mulholland owned 77%, and Melanie Mulholland owned 23%. And, as the Objectors emphasize, the Mulhollands' interests in UTR 3 were identical: James Mulholland owned 77% while Melanie Mulholland owned 23%. The Objectors thus argue that the transfer of Water's Edge from the Mulhollands to UTR 3 was for adequate consideration because the Mulhollands' financial interest in the property was unchanged after the transaction.

But that rationale is coherent only insofar as UTR 3 is considered a nominee of James Mulholland. If UTR 3 is, as the Objectors argue, a legally independent entity, then there can be no dispute that James Mulholland received inadequate compensation for Water's Edge. The Objectors' argument that "Mr. Mulholland received fair value as the value of his membership interest in UTR 3 increased by the value of his prior interest in the real estate" appears to assume

James Mulholland exercises control over and realizes benefits from UTR 3's assets. Obj. Supp. Br. at 10.

Second, the transfers of assets from the Mulhollands to UTR 3 were made in anticipation of judgment enforcement efforts by the SEC. The transfer of Water's Edge to UTR 3 took place on November 10, 2015. The transfer thus occurred approximately two years after judgment was entered in this matter, and approximately one year before the SEC issued the abstracts of judgment against James Mulholland. *See* ECF Nos. 26, 30, 31. The Mulhollands established both UTR 3 and UTR 2 after judgment was entered and proceeded to transfer a number of assets out of their own name and into UTR 3. And the jail telephone calls provided by the SEC strongly suggest that the Mulhollands transferred those assets to prevent creditors like the SEC from reaching them:

> [Melanie:] Will you just – will you just ask Andrew about that too? Like restitution, can they go after like our properties and stuff?
>
> [James:] Well, they could go after anything that's in my name, but I don't have anything in my name, right?
>
> [Melanie:] Well, as long as – as long as Water's Edge isn't. But –
>
> [James:] It's an LLC.
>
> [Melanie:] I know, but when you look at the tax bill, it has your name on it.

August 12, 2016, Tr. at 9–10.

Third, there is an exceedingly close relationship between the nominee and the transferor. In fact, as explained above, the Objectors' argument regarding consideration underscores this relationship: James and Melanie Mulholland received adequate consideration for the transfer of Water's Edge only if the transfer essentially involved a reshuffling of their assets. The Mulhollands owned Water's Edge and after the transfer they owned UTR 3 which owned Water's Edge. That

additional degree of legal separation is not meaningful because the Mulhollands' finances were essentially unchanged after the transaction.

Fourth, the transfer from James and Melanie Mulholland was recorded, and so this factor weighs against an alter ego/nominee finding. Fifth, the Mulhollands retained possession of Water's Edge after the transfer for the same reasons discussed regarding the third factor. Sixth, the Mulhollands eventually sold Water's Edge to a third party for what appears to be fair value, thus deriving full benefit from the asset.

Five of the six factors weigh in favor of a finding that UTR 3 is merely a nominee for the Mulhollands. There was essentially a complete identity of interests between the Mulhollands and UTR 3, and, more importantly, the company appears to have been created solely for the purpose of placing James Mulholland's assets outside the reach of his creditors. In this situation, allowing James Mulholland to shield his assets behind the corporate form would work a fraud on the Court (and the SEC). UTR 3 is a nominee of the Mulhollands.[11]

### iii.

Having established that the SEC can garnish the assets of UTR 3 as if they were James Mulholland's assets, the next question is whether the transfer of the proceeds of the Water's Edge sale from UTR 3 to UTR 2 was a fraudulent conveyance. Michigan has adopted the Uniform Fraudulent Transfer Act, M.C.L. 566.31 *et seq.* Sections 566.34 and 566.35 govern fraudulent transfers.[12] A creditor alleging that a fraudulent conveyance occurred has the burden of proving

---

[11] The further significance of the fact that James Mulholland owns only a 77% interest in UTR 3 is discussed below.

[12] There is confusion in the briefing regarding whether Michigan law or federal law governs the SEC's fraudulent conveyance claim. 28 U.S.C. § 3304 ("Transfer fraudulent as to a debt to the United States") would govern if the order of disgorgement entered in this case creates a "debt to the United States." The Court has identified authority standing for the proposition that orders of disgorgement do not create a debt under the Federal Debt Collection Procedures Act. *See* S.E.C. v. Huffman, 996 F.2d 800, 803 (5th Cir. 1993) *and S.E.C. v. AMX, Int'l, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993). The Court is aware of no contradictory authority. Thus, no federal statute applies and Rule 69(a) establishes that Michigan law governs "in proceedings supplementary to and in aid of judgment or execution."

the elements of the claim by a preponderance of the evidence. *Id.* at § 566.34(3). Pursuant to § 566.34(1), "a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred," if the transfer occurred in one of the following circumstances:

> (a)  With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (b)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
>
> > (i)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
> >
> > (ii)  Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Id.*

Section 566.34 also identifies the factor to consider in determining whether a transfer was made with actual intent to defraud:

> (a)  The transfer or obligation was to an insider.
>
> (b)  The debtor retained possession or control of the property transferred after the transfer.
>
> (c)  The transfer or obligation was disclosed or concealed.
>
> (d)  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (e)  The transfer was of substantially all of the debtor's assets.
>
> (f)  The debtor absconded.
>
> (g)  The debtor removed or concealed assets.
>
> (h)  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

*Id.* at § 566.34(2).

The Uniform Voidable Transactions Act includes an alternative section regarding only transactions made *after* the debt or obligation was incurred. Specifically, pursuant to 566.35(1), a transfer made after the debt is incurred is voidable if "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Additionally, "[a] transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." *Id.* at § 566.35(2).

Here, the transfers of the proceeds of the Water's Edge sale from UTR 3 to UTR 2 were fraudulent conveyances. As the SEC explains, UTR 3 and UTR 2 were created only after the disgorgement order was entered. Prior to that time, the Mulhollands owned real properties and established bank accounts in their individual capacities. In 2015 (two years after entry of judgment), Water's Edge was transferred to UTR 3 for $10 consideration. As the Objectors explain, that transaction is not fraudulent because James and Melanie Mulholland owned Water's Edge in the same proportion as they had interests in UTR 3 (77% and 23% respectively).[13]

---

[13] Or, at least, the transaction was not a fraudulent conveyance within the meaning of M.C.L. 566.31 *et seq.* As explained above, the circumstances of the transaction suggest that James Mulholland meant to use UTR 3 to hide his assets from creditors.

Rather, the SEC argues that the fraudulent conveyances occurred after UTR 3 sold Water's Edge. In 2016, Water's Edge was sold for approximately $1.9 million. Melanie Mulholland alleges that $1,080,000 of the proceeds were used to pay federal income taxes arising out of the sale. She further alleges that the remaining funds were transferred to UTR 2 as a loan "to allow UTR 2 to make investments at the direction of Melanie." Objs. Sec. Supp. Br. at 11. Melanie has provided only her declaration in support of those assertions. She has not provided documentation of the alleged loan from UTR 3 to UTR 2, nor has she submitted proof that federal taxes were paid from the proceeds of the Water's Edge sale.

The SEC has identified, via bank records, approximately $1.1 million that was transferred from UTR 3 to UTR 2 on November 17, 2016. That transfer occurred less than a month after Water's Edge was sold. The SEC has further identified, via bank records, another $222,000 transferred from UTR 3 to UTR 2 in March 2017.

Given the absolute lack of any evidence corroborating Melanie Mulholland's theory that the transfers from UTR 3 to UTR 2 were a loan, the SEC has satisfied the elements of § 566.35(1) and (2). First, the transfers were made without any exchange of value, much less reasonably equivalent value. Second, James Mulholland has not made any payments to satisfy the order of disgorgement, despite them having long since come due. The SEC represents that James Mulholland has no remaining assets in his name. And the Objectors do not challenge that assertion or otherwise indicate that payment from James Mulholland will be forthcoming.[14] Thus, James Mulholland "made the transfer . . . without receiving a reasonably equivalent value . . . and the debtor was insolvent at that time." § 566.35(1).

---

[14] A debtor that is not paying debts as they become due "other than as a result of a bona fide dispute is presumed to be insolvent." § 566.32(2).

Additionally, the transfer was made to James Mulholland's wife, an "insider" as defined by the statute. *See* § 566.31(h)(i)(A). Because the disgorgement order existed at the time of the transfer, James Mulholland was insolvent at the time, and Melanie Mulholland was aware of her husband's overdue obligations and the state of his assets, the transfers in questions are likewise voidable pursuant to § 566.35(2).

And, for good measure, there is very good reason to find that the transfers were made with "actual intent to hinder, delay, or defraud any creditor of the debtor." § 566.34(1)(a). As previously mentioned, the transfers were to an insider (meaning § 566.34(2)(a) is met). James Mulholland had already been sued (and, in fact, ordered to disgorge) at the time the transfers were made. *See* 566.34(2)(d). The maze of companies which appear to have been created for the sole purpose of obscuring the assets of James and Melanie Mulholland, and the series of transfers between those companies for little consideration, operated to conceal both the assets and the transfers themselves. *See* § 566.34(2)(c) & (g). James Mulholland did not receive reasonably equivalent value for the assets, § 566.34(2)(h), and was insolvent at the time of the transfers. § 566.34(2)(i). The establishment of the companies at issue and transfers occurred within a reasonably short time after judgment was entered. *See* § 566.34(2)(j).[15] Thus, seven of the eleven statutory factors weigh, in varying degrees, in favor of a finding of actual intent to defraud. And none of the remaining factors weigh against a finding of actual intent.

In short, the transfers of assets from UTR 3 to UTR 2 are voidable pursuant to at least three provisions of the Uniform Fraudulent Transfer Act. At the very least, James Mulholland was

---

[15] Although the transfers that are ultimately being voided did not occur until several years after judgment was entered, the record strongly suggests that the Mulhollands immediately began efforts (by creating holding companies and transferring assets) to conceal assets from the SEC.

entitled to 77% of the proceeds from the sale of Water's Edge (or $649,324.95[16]). The transfer of those funds to UTR 2 from UTR 3 was fraudulent and accordingly will be voided.

## iv.

One issue remains. Transfer of James Mulholland's share of the proceeds from the sale of Water's Edge was commingled with other funds (including funds undisputedly owned solely by Melanie Mulholland). And, according to Regions Bank, only $427,216.61 remains in UTR 2's bank account. Thus, the extent to which the SEC may seize commingled funds must be established.

Pursuant to traditional equitable rules regarding commingled accounts, "when a trustee commingles trust funds and personal funds, any funds removed from the commingled account are presumed to be personal funds. In other words, funds held in trust will remain in a commingled account for as long as possible." *United States v. NBD Bank*, N.A., 922 F. Supp. 1235, 1243 (E.D. Mich. 1996). *See also Matter of Michigan Boiler & Eng'g Co.*, 171 B.R. 565, 570 (Bankr. E.D. Mich. 1993). Constructive trusts are legal fictions "designed to prevent unjust enrichment" and "'may be imposed when property has been obtained through fraud, misrepresentation, or concealment.'" *Id.* at 1242 (quoting *Kammer Asphalt Paving Co., Inc. v. East China Township Sch.*, 504 N.W.2d 635 (E.D. Mich. 1993)). Given the circumstances, it is appropriate to conclude that Melanie Mulholland possessed her husband's assets in a constructive trust. Operating under the presumption that Melanie Mulholland expended her own funds first, all $427,216.61 that remains in the bank account is James Mulholland's property.

---

[16] This sum is derived from taking the sale price of Water's Edge ($1,923,279.16), subtracting the portion used to pay federal tax liabilities resulting from the sale ($1,080,000), and then multiplying the resulting number ($843,279.16) by .77. The sum of that series of operations is $649,324.95.

For the reasons articulated in this opinion, the SEC may directly garnish those funds. Melanie Mulholland's and UTR 2's objection to the SEC writ of continuing garnishment will be overruled, and Regions Bank will be directed to disburse the funds in question to the SEC.

**IV.**

Accordingly, it is **ORDERED** that the Plaintiff SEC's motion for leave to file a reply brief, ECF No. 52, is **GRANTED** and the reply brief, ECF No. 52, Ex. 2, is **ACCEPTED as filed.**

It is further **ORDERED** that Melanie Mulholland's and UTR 2's motion to strike partial transcripts, ECF No. 55, is **DENIED.**

It is further **ORDERED** that Melanie Mulholland's and UTR 2's objection to the SEC's writ of garnishment, ECF No. 35, is **OVERRULED.**

It is further **ORDERED** that Garnishee Regions Bank is **DIRECTED** to **DISBURSE** the funds identified in the writ of continuing garnishment, ECF No. 34, to the Plaintiff SEC.


Dated: November 17, 2017                                    s/Thomas L. Ludington
                                                           THOMAS L. LUDINGTON
                                                           United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 17, 2017.

                        s/Kelly Winslow
                        KELLY WINSLOW, Case Manager